359 A.2d 329.

PROVIDENCE AND WORCESTER COMPANY *et al.*
*vs.* EXXON CORPORATION *et al.*
PROVIDENCE AND WORCESTER COMPANY *vs.*
HUMBLE OIL & REFINING COMPANY *et al.*

JUNE 10, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

472

PAOLINO, J. These are two appeals from a judgment entered in the Superior Court in two civil actions consolidated for trial and heard together before a justice of that court sitting without a jury.[1]

The complaint in the first of the two actions, No. 72-1562, prayed for a mandatory injunction ordering defendants to remove certain obstructions from a right-of-way and permanently enjoining defendants from obstructing the way.

The complaint in the second action, No. 73-2372, prayed for the same mandatory injunction as in the earlier case and also for a declaratory judgment declaring the rights, status and other legal relations of the parties under reservations contained in a deed from plaintiffs' predecessor to defendants' predecessor dated August 28, 1941. It is undisputed that this deed, which will hereinafter be referred to as "the 1941 deed," is the basic document upon which the ultimate resolution of these appeals rests. This complaint also contained a prayer that the court order

[1]On October 8, 1974, an order granting defendants' motion under Super. R. Civ. P. 62(a) and (c) for a stay of the mandatory injunctions granted by the trial justice pending the appeals was entered in the Superior Court.

On August 15, 1975, while the case was pending on appeal in this court, the following stipulation was entered in this court:

"Defendant Getty Oil Company (Eastern Operations), Inc., in its own right and as successor in interest of Getty Oil Company, hereby discontinues its appeal in the above-entitled cause, withdraws as a party appellant in each of the above-consolidated cases and agrees that with respect to it, the Judgment of the Superior Court in each of said cases may be affirmed in all respects."

defendants "* * * to prepare and deliver to Plaintiffs a conveyance of the existing pier and vessel berth." The pier referred to is the Wilkesbarre Pier, so-called, hereinafter sometimes called "the pier."

There are many facts which relate to this case in one way or another but, for the sake of brevity, the factual discussion which follows relates only those facts which we perceive to be pertinent to our holding herein.

This case involves a dispute over the rights of several parties to a pier extending from the shore in the city of East Providence into Providence harbor. The pier was constructed during the 1870's by the Wilkesbarre Coal and Iron Co. and was later acquired by the Providence and Worcester Railroad Company (P&W), the predecessor in interest of plaintiff Providence and Worcester Company, a Delaware Corporation (P&W-Del.). Until the pier was partially destroyed by the 1938 hurricane, it was used primarily as a facility for unloading coal and iron from deep water vessels onto railroad cars. That storm destroyed only the coal-unloading facilities on the pier while the pier itself remained structurally sound.

P&W conducted railroad operations from 1844 until 1888, when it leased substantially all of its real and personal properties, excepting its corporate seal and record books, to the New York, Providence and Boston Railroad Company, the predecessor in interest of the New York, New Haven and Hartford Railroad Company (New Haven). In 1892, P&W executed a new lease of said properties for a term of 99 years to New Haven, thus cancelling the 1888 lease. By the terms of the 1892 lease, New Haven was granted a general power of attorney by which New Haven could "* * * bargain and sell lands and structures of the lessor on such terms as to the lessee shall seem meet * * *." By the same instrument, P&W agreed to

affix its corporate seal, upon New Haven's request, to all such deeds and conveyances.

The first major transaction under this lease provision regarding the pier that is the subject of this controversy was a deed to the pier and some of the adjoining land, executed in 1941 between New Haven and the Colonial Beacon Oil Company (Colonial). This conveyance was accomplished with P&W's full acquiescence but it contained a reservation of rights in the pier facility by P&W. The construction to be given to the language of this reservation is the root issue of the present controversy and an understanding of the issue requires the inclusion herein of certain background information which sheds some light on the respective intents of the parties to the 1941 conveyance.

There were three parties who participated in the negotiations which culminated in a sizeable transaction of which the 1941 deed was but a part. These parties were New Haven, Colonial, and P&W and it is the position of each of the parties to the current litigation, who are all successors in interest in some degree to one or more of the three contracting parties, that an examination of the motives of the original parties will dictate a particular construction of the deed reservation and thus a verdict in their favor. This contractual intent is to be gleaned largely from documentary evidence submitted at trial consisting in large measure of correspondence among the principal negotiators for the parties and certain leases of other premises executed among the parties on the same date that the 1941 deed was executed.

Insofar as New Haven is concerned, the following information is pertinent. The pier had been damaged during the 1938 hurricane and was in need of expensive repairs if it was to be returned to its full railroad operating potential. Under the 1892 lease, New Haven would most likely

have been found to have had an obligation to P&W to return the pier to such operating condition. However, because New Haven had a comparable facility on the Providence side of the harbor, it was unwilling to spend the money required to effect the necessary repairs to the Wilkesbarre pier. Thus New Haven desired to sell the pier and thus rid itself of the tax and maintenance liability that the pier represented.

Similarly, the circumstances under which the deed was procured indicate that Colonial had a significant interest in having the use of the pier and the appurtenant right-of-way. Colonial owned a petroleum storage depot in the Phillipsdale section of East Providence, several miles upstream from the pier. Because the waters of the Seekonk River were too shallow at that point to accommodate deep water tankers, Colonial was required to use other means of transporting oil from deep water ports to its depot. Accomplishing this task by the use of shallow draft barges was a costly and inefficient process. Colonial desired, therefore, to install a pipeline extending from the deep water vessel berth at the pier to its Phillipsdale depot by way of a right-of-way which belonged to P&W and New Haven and which followed that very route.[2] In this, Colonial hoped to alleviate, to some extent, the competitive disadvantage it suffered in having no direct access to the sea.

P&W's situation in 1941 sheds considerable light on its intention in including the contested reservations in the 1941 deed. Since 1935, New Haven had been in bankruptcy and its affairs were administered by trustees ap-

---

[2]Part of this railroad right-of-way was actually owned by New Haven, but a large part of it was owned by P&W and used by New Haven by virtue of the 1892 lease. P&W was not involved in any of the dealings relating to the use of the railroad right-of-way for installation of a pipeline. These dealings involved only New Haven and Colonial.

pointed by the United States District Court for the District of Connecticut. P&W, aware that the 1892 lease was subject to possible disaffirmance by the trustees in bankruptcy, sought to participate directly in any negotiations between Colonial and New Haven regarding the pier, to secure an affirmation of the 1892 lease and thus to insure that P&W would not have to commence independent operations.

P&W was aware also that a future disaffirmance of the 1892 lease, pursuant to another reorganization or the termination of such lease by expiration, would require it to operate, if at all, as an independent railroad company. If this ever became the case, P&W would need its own free, direct access to the sea. With this in mind, P&W's negotiator sought the inclusion of a reservation in the title deed to the pier, whereby P&W would have the use of the pier if circumstances should ever warrant such use.

The negotiations among the parties culminated in a package of agreements which can be fairly summarized as follows:

1) Colonial bought and New Haven, acting pursuant to the 1892 lease, sold the pier and the easterly portion of the land at the foot of the pier now owned by Union Oil Company (Union). (A sketch of the pier and surrounding area is attached as Appendix A.)

2) New Haven leased to Colonial the right to install, maintain and use a pipeline for the transportation of petroleum products along P&W's and New Haven's right-of-way between the pier and the Phillipsdale depot.[3]

---

[3] In 1948 New Haven permitted Colonial's successor, Standard Oil Company of New Jersey, to install a second pipeline adjacent to the first to be used for the transmission of gasoline from tankers unloading at the pier to the storage terminal. This was a terminable right, and P&W was not a party to the agreement, nor was P&W's corporate seal affixed thereto.

3) To the extent that they were empowered to do so, New Haven's trustees affirmed the 1892 lease.

4) New Haven leased a parcel of land owned by P&W at the southeasterly end of the pier to Colonial for a term to end upon the termination of the 1892 lease and P&W leased the same parcel to Colonial for an indefinite term to commence upon the expiration of the 1892 lease and to be terminated at will by P&W upon 6 months' notice. P&W insisted upon retaining a fee interest in this land in anticipation of its future use as an access route to a proposed switching yard which would be constructed east of railroad tracks owned by the Providence, Warren and Bristol Railroad Company. This latter company was a small railroad controlled by New Haven, whose tracks formed the easterly boundary of P&W's holdings to the southeast and east of the pier.

5) The deed by which the above-described property was conveyed by New Haven to Colonial included a reservation of certain rights to P&W. The pertinent portion of the deed describes the first portion of said reservation as

> "* * * the right to construct and maintain a pier on said Parcel No. 1 in the area between the southeasterly boundary thereof and the northwesterly line of the present pier thereon extending westerly to said established harbor line * * * the right to construct a pier being deemed to include the right to remove any pier now or hereafter existing within said area, to extend a pier constructed in the exercise of the right hereby reserved and to construct at any time or from time to time a new pier in place of any pier constructed in the exercise of said right, provided that such removal, extension and construction shall be done in such manner as not to interfere with the use hereinafter provided for by the Grantee, its successors or assigns, of the northerly side of a pier within said area * * *."

The second clause of the reservations to P&W included the right to have the area adjacent to any pier constructed pursuant to the above-quoted language "* * * kept free from structures which would prevent the berthing of vessels on the northerly side of said pier * * *."

The third and final right reserved to P&W under the 1941 deed was a right-of-way, variably 40 feet and 24 feet in width, "* * * in the location indicated upon said plan for a railroad track and roadway * * *." (See Appendix A.) The grantee was not required to keep the right-of-way free of obstructions so long as P&W did not desire to use the same in connection with the pier but it was required to clear the right-of-way of all obstructions upon 90 days' written notice from P&W. The described right-of-way provided passage between any pier that P&W might possess under the first reserved right and other properties owned by it. (The entire passage of the 1941 deed relating to these reservations is affixed hereto as Appendix B.)

As previously indicated, it is the nature, extent and meaning of the above-described reserved rights which are at issue here. Therefore only a few of the events which occurred subsequent to the 1941 conveyance need be recounted herein for the purpose of describing the current positions of the several parties to this litigation.

By deeds executed in 1962 and 1964, respectively, Humble Oil & Refining Company (Humble), which was the corporate successor of Colonial and whose corporate successor in turn is Exxon Corporation (Exxon), conveyed to Tidewater Oil Company (Tidewater), whose corporate successor is Getty Oil Company (Eastern Operations), Inc. (Getty), an undivided 40 percent interest in the pier and all lands conveyed to Colonial under the 1941 deed including the pipeline right-of-way and the pipeline itself. In November 1969, Humble conveyed to Union an un-

divided 20 percent interest in the same premises exclusive of the pipeline and pipeline right-of-way. Union then owned and presently owns a petroleum storage depot consisting of a group of oil storage tanks erected on land located at the inbound (i.e. easterly) end of the pier. (See Appendix A.) These tanks are fed directly by a separate pipeline owned by Union situated on the pier.

The current record ownership of the pier itself and the land on which it rests is 40 percent in Exxon, 40 percent in Getty and 20 percent in Union.

Regarding P&W-Del.'s current status, it suffices to note that New Haven, having emerged from its original bankruptcy in 1947, was again declared bankrupt in 1961. Pursuant to the plan for the reorganization of New Haven, the 1892 lease to New Haven from P&W was rejected by the trustees in bankruptcy as of December 31, 1968. As a consequence of said rejection, P&W-Del. applied to the Interstate Commerce Commission for permission to resume independent operations. The application was approved and on February 3, 1973, P&W-Del. became an independent railroad.

Before delving into the legal aspects of the case, a brief word is required to explain plaintiff Seekonk Realty's (Seekonk) participation in these proceedings. Seekonk is a wholly-owned subsidiary of the Independent Oil Company (Independent). The latter owns an oil storage facility adjacent to those owned by Getty and Exxon in Phillipsdale. As mentioned previously, these facilities are not located near a deep-water port and Independent, therefore, has been required to rely on the use of small barges for the transport of petroleum products from tankers to its Phillipsdale depot. Hudson Realty Company (Hudson), Seekonk's predecessor and likewise a wholly-owned subsidiary of Independent, was unsuccessful in its attempt to reach an agreement with Humble (later Exxon) and

Getty whereby Hudson would acquire the right to use the pipelines between the pier and Phillipsdale which had been constructed by Humble and Getty pursuant to the 1941 agreements.[4] In response to the competitive disadvantage that Independent suffered, Hudson, in 1970, acquired from P&W-Del. a pipeline easement and an assignment of pier rights which now belong to Hudson's successor, plaintiff Seekonk. Thus, insofar as Seekonk's rights derive from those of P&W-Del., the former has an an interest in the ultimate resolution of this action.

It was in the context of all the foregoing that P&W-Del., in 1971, commenced preparation of the pier in anticipation of the railroad's independent operations. Foremost among said preparations was to be the reconstruction of the south side of the existing pier and the construction of a railroad and roadway along the 40-foot right-of-way and onto the pier itself. Similarly, Seekonk wanted to commence laying a pipeline under the 40-foot right of way and onto the pier for purposes of unloading petroleum products from tankers.

To that end of getting the described preparations under way, discussions were conducted presumably among all plaintiffs and defendants. The defendants refused to yield to plaintiffs and on March 8, 1972, P&W-Del. served written notice upon defendants demanding that the 40-foot right-of-way be cleared of all obstructions in order that P&W-Del. might make use of its reserved pier rights. When defendants failed to remove such obstructions with-

---

[4]In 1972 the pipelines belonging to Getty and Exxon caught fire and were declared unsafe. Their use has been prohibited by the city of East Providence since that time. Consequently, both Exxon and Getty have had no tanker-unloading capabilities and have been forced to supply their storage depots with shallow-water barges. Furthermore, Getty's and Exxon's right to use the pipeline right-of-way terminated automatically upon the rejection of the 1892 lease and the resumption of independent operations by P&W-Del.

in the 90 days allotted them under the 1941 deed reservations, the instant actions were instituted by the filing of complaints in the Superior Court in June 1972, and September 1973.

As previously stated, the first of the two complaints prayed for a mandatory injunction ordering defendants to remove all obstructions from the above-described right-of-way and permanently enjoining any future obstruction thereof. The second action sought the same mandatory injunction as the first but prayed additionally for a declaration of the rights, status and other legal relations of the various parties under the reservations to the 1941 deed.

In the Superior Court, plaintiff P&W-Del. contended in substance, that, notwithstanding the fact that the 1941 deed conveyed a fee interest in the pier and surrounding lands to Colonial, P&W, plaintiff's predecessor, retained a right to immediate possession of the pier under the reservation.

The defendants rebutted this argument with the contention that the deed reservations empowered P&W to construct a new pier within the lines of the existing pier and to remove the existing pier in order to accomplish this. The defendants maintain that until such new pier would be constructed by P&W or its successors, P&W-Del. could not exercise any rights under the terms of the reservation. The defendants' argument was essentially that the reservation bestowed upon P&W and its successors an easement to construct a pier upon realty owned in fee by Colonial and its successors within the exact area occupied by the existing pier, and that P&W-Del., once it completed construction, would own only the pier structure itself exclusive of the underlying realty.

On September 12, 1974, the trial justice rendered his decision in the case. In it he concluded that plaintiffs had provided defendants with due and proper notice in

their effort to enforce their alleged rights under the 1941 deed reservations; that the pier was the only access to the sea ever possessed by P&W-Del. or its predecessor; that at the time the deed was executed, P&W had an interest in preserving its rights to the pier; and that this satisfactorily explains the inclusion of the reservation in the deed.

The trial justice found that by the time the case came to be heard by him "* * * Getty['s] and Exxon's rights were terminated by virtue of the U.S. District Court order * * *." We understand this to refer to the fact that the rejection of the 1892 lease during the second New Haven reorganization in 1968 caused Colonial's successors in interest to lose their rights under the several leases of the pipleine right-of-way executed contemporaneously with the 1941 deed. The trial justice observed therefore, that, even if the pipes to Phillipsdale were in good condition, Getty and Exxon have no right to use them.

The trial justice then went on to comment on the adversary claims of the parties. He noted that defendants did not dispute plaintiffs' rights in the pier facility, but he queried whether defendants' interpretation of those rights might be unreasonable. He opined that to require plaintiffs to raze a structurally sound pier only to replace it with another of the same type at a cost of at least $5 million "would be placing an albatross around the neck" of plaintiffs. He observed that such an interpretation made "no sense" in that it benefited no one. The justice went on to find that plaintiffs' plan to spend one-half million dollars to reinforce the southern portion of the existing pier so that it might accommodate railroad usage was "reasonable" and that it made "good sense."

The trial justice held, therefore, that plaintiffs are the

owners of the existing pier and are entitled to immediate use of the pier including the vessel berth on the northerly side thereof, subject only to rights reserved in defendants by the 1941 deed. Second, he held that, to these ends, defendants must convey to plaintiffs a fee simple in the pier including a right to use the said vessel berth. Third, he held that the 40-foot wide right-of-way could be used by plaintiffs as access (via pipeline and/or roadway and/or trackage) to the tide flowed land owned by P&W-Del. south of the pier as well as to the pier itself. Fourth, he decided that, in order to accommodate plaintiffs' projected use of the right-of-way, defendants must remove all obstructions therefrom at their own expense, including those "sub-surface obstructions which must of necessity be removed" to allow the proposed laying of plaintiffs' new pipeline. Finally the court agreed to reserve jurisdiction in the cases for the purpose of entering orders from time to time as required.[5]

An order was presented embodying these holdings and judgment was entered accordingly on September 24, 1974 as of September 23, 1974. It is from this judgment that defendants appeal. They have argued these appeals under ten main points and, for convenience, we shall, insofar as is practical, treat the issues in like manner.

## Point 1

The defendants' first argument is that, for any of several suggested reasons, the usual rule that a trial court's findings are conclusive when supported by substantial evidence and when not clearly wrong, does not apply in

[5]During oral argument counsel for the opposing parties agreed to file a stipulation in this court deleting that portion of the judgment (paragraph 6), whereby the Superior Court reserved jurisdiction in these cases for the purposes set forth in paragraph 6 of the judgment. They also agreed that the stipulation would provide that we overrule the judgment pro forma insofar as paragraph 6 is concerned. Such a stipulation was filed on March 19, 1976.

this case. Primarily, defendants argue that the trial justice's so-called findings of fact regarding the language of the 1941 deed reservation were really conclusions of law and hence are reviewable by this court. In aid of this proposition defendants invoke the rule of law that where the language of an instrument is clear and unambiguous, questions of interpretation are for the court and not for the factfinder.[6] The defendants' central contention, therefore, is that because the 1941 deed reservation is clear and unambiguous, the trial justice's interpretation thereof is a conclusion of law subject to our scrutiny.

In lieu of the preceding argument, defendants are content to rely on the rules of law that where the testimony concerning the facts is substantially undisputed[7] or where the facts are almost entirely documented,[8] this court is in just as good a position as the trial court to apply the facts to the law and thus to dispose of the dispute. The defendants argue that the evidence in this case fits this description and therefore that this court should independently examine the record and draw inferences therefrom irrespective of the trial justice's efforts in this same vein.

We concur in defendants' observation that the disposition of this entire case hinges upon the interpretations to be given the 1941 deed reservations. We do not agree,

---

[6]The defendants cite *Cassidy* v. *Springfield Life Ins. Co.,* 106 R. I. 615, 262 A.2d 378 (1970); *Russolino* v. *A. F. Rotelli & Sons,* 85 R. I. 160, 128 A.2d 337 (1957).

[7]In this regard, defendants rely on *DeSpirito* v. *Bristol County Water Co.,* 102 R. I. 50, 227 A.2d 782 (1967) and *Matteson* v. *Wm. S. Sweet & Son,* 58 R. I. 411, 193 A. 171 (1937).

[8]The defendants rely on the following authority from foreign jurisdictions to support this proposition: *DeSantis* v. *Dixon,* 72 Ariz. 345, 236 P.2d 38 (1951); *Thompson* v. *Blanchard,* 116 Colo. 27, 178 P.2d 422 (1947). Other citations of authority are omitted herein.

however, with their claim that the pertinent language therein is clear and unambiguous. The clause in question reserves to P&W-Del. the right to "construct *and* maintain" a pier on the site of the existing pier. Further along in the same clause it is stated that P&W-Del's right to construct a pier shall be "deemed to include the right to remove any pier now or hereafter existing" at the site. Still later in the passage reference is made to the grantee's right to keep obstructions on the property but only so long as P&W did not wish to use the premises "in connection with the construction *or* maintenance of a pier." (See Appendix B.) Furthermore, in the agreement between the same parties, dated on the same date as the 1941 deed, reference is made to P&W's rights under its lease to New Haven "to the construction, *reconstruction, equipment or maintenance*" of a pier located on the deeded premises. (Emphasis added.) The very lack of consistency among these passages which are all part of a single transaction serves to obscure the intent of the parties and sufficiently rebuts defendants' claim herein that the language of the pertinent documents is clear and unambiguous. This may appear to be a study in *minutiae* but it must be remembered that, even by defendants' own surmisal, the central issue of this controversy is whether P&W-Del. has a right to construct a new pier and then to maintain it or whether it may exercise its right merely by maintaining the existing pier.

While we reject defendants' claim that the language of the deed reservation is clear, we do agree with their observations that the testimony concerning the facts is substantially undisputed and that almost all of the record evidence of the circumstances at the time of the 1941 transaction is documentary in nature. We, therefore, endorse defendants' conclusion that this court is in as good

a position as the trial court to draw inferences from the facts.

However, as we noted in *Arden Eng'r Co.* v. *E. Turgeon Constr. Co.,* 97 R. I. 342, 348, 197 A.2d 743, 746 (1964), while this court may draw inferences from undisputed and uncontradicted evidence, the drawing of an inference is initially the function of the trier of facts. The trial justice's conclusion will be accepted by this court if the inference he drew was reasonable even though other equally reasonable inferences to the contrary might have been drawn.

Turning now to the matter at hand, we reiterate that this entire case depends upon the interpretation to be given the language of the 1941 deed reservation. The trial justice inferred from the language of the reservation clause, and from the undisputed evidence of the circumstances surrounding the execution of the 1941 transaction that the intention of the parties at that time was not as defendants perceived it to have been. He concluded that plaintiffs' interpretation was a reasonable one which made good sense, and that defendants' reading of the pertinent language was unreasonable and made no sense.

On this record we cannot say that the trial justice, on the basis of the evidence before him, drew an unreasonable inference when he concluded that the intention of the parties in 1941 was not to require P&W or its successors to demolish the existing pier and to build a new one in order to enjoy its contractual rights. His conclusion in this regard must stand.

### Point 2

The defendants' next contention is that the trial justice erred in attempting, in his decision, to determine the title to land submerged under tidewater lying south of the pier. They argue that title to this land was not an issue in this case either by virtue of the complaint or any of the other

pleadings in the case before the Superior Court. Additionally, they contend that the only record evidence regarding this land consisted of early deeds which, at best, could only establish prima facie validity of the title since the entire chain of title was not presented. Finally, they argue that G. L. 1956 (1969 Reenactment) chapter 9 of title 34, confers initial, original and exclusive jurisdiction on this court to determine boundaries within which riparian owners may fill in tidelands and that, therefore, the purported determination of this issue by the trial justice was purely gratuitous.

The plaintiffs' rebuttal to defendants' contentions in this regard consists of a summation of the trial evidence tending to support their claim to use of the 40-foot wide right-of-way as access to the tide-flowed land south of the pier. First, they note that the plan attached to the 1941 deed depicts a right-of-way, 40 feet wide, extending across the entire width of the pier so that it abuts the tide-flowed land. (See Appendix A.) Second, defendants refer to a letter, dated July 1941, wherein P&W's president expressed to Colonial's counsel an interest in the availability of parcel 4 (see Appendix A) in connection with a proposed second pier to be constructed on the tide-flowed land south of the existing pier. The plaintiffs rely on this letter as proof of P&W's intent to retain access to said tide-flowed land.

Finally, plaintiffs note that deeds dated 1873 and 1882 evidencing their entitlement to the said tide-flowed lands are on the record. Their claim is that these deeds were introduced only for the purpose of showing plaintiffs' interest in the use of the right-of-way and that a finding by the trial justice relative to their ownership of the tide-flowed lands was relevant to their entitlement to the right-of-way as access to that land as well as to the pier.

In its reply brief, defendants counter plaintiffs' argument with a contention that because no land existed south of

the pier in 1941 an easement to pass and repass into such area could not have been contemplated at that time. They argue that to attempt, at this point in time, to enlarge the easement to include a right of access to and egress from the tide-flowed lands south of the pier would constitute an illegal overburdening of the easement by reservation created by the 1941 deed.

At the threshold, we note our agreement with defendants that title to the described tide-flowed lands was not and is not now an issue in this controversy. The complaint in the action for the declaratory judgment demands only that the parties' rights, status and other legal relations under the reservation clauses of the 1941 deed be declared. No demand was made for a declaration regarding title to the tide-flowed lands. The trial justice therefore erred by including in his bench decision a statement to the effect "* * * that the complainants are entitled to the tide water land south of the pier." We therefore hold that, on the basis of the record compiled in this litigation including pleadings, exhibits and testimony, neither this court nor the Superior Court may declare title to these lands to be in any particular party.

We note, however, that the deeds dated 1873 and 1882 are part of the record and indicate that at least prima facie title to the tide-flowed lands rests in plaintiff P&W-Del. This is so even by defendants' own admission in their brief. We note further that, as mentioned by plaintiffs in their brief, the plan attached to the 1941 deed indicates that the 40-foot wide right-of-way spans the entire width of the pier. Thus, it would seem reasonable to surmise that the parties intended the right-of-way to serve as access to the land south of the pier as well as to the pier itself.

On the basis of these facts, we conclude that, irrespective of the ownership of the tide-flowed lands south of the pier, the trial justice was justified in concluding that the 40-foot

wide right-of-way was meant by the parties to the 1941 transaction to service those lands as well as the pier itself. We hold, therefore, that the trial justice erred by stating in his bench decision that P&W-Del. was entitled to "the tide water land" but that he did not err by including in the judgment a declaration of the extent of plaintiffs' easement over the 40-foot wide right-of-way. Insofar as this appeal was taken from the judgment and not from the decision upon which the judgment was based, the error in the decision is not a matter requiring reversal by this court. Paragraph 3 of the judgment declaring plaintiffs' right to use the easement as access to the tide-flowed land is affirmed.

In response to defendants' final contention under this point, we note simply that the trial justice had jurisdiction under §8-2-14, as amended,[9] and chapter 30 of title 9,[10] to decide the question of entitlement to the tide-flowed land. The title and chapter[11] cited by defendants is not applicable here.

### Points 3, 4 and 5

Under these points in their brief defendants challenge the validity of the order in paragraph 2 of the judgment ordering defendants to "* * * forthwith convey in fee simple to the Complainants the presently-existing Wilkesbarre Pier, including the right to use said vessel berth on the northerly side of said Pier."

---

[9]General Laws 1956 (1969 Reenactment) §8-2-14 provides:

"The superior court shall have original jurisdiction of all actions at law where title to real estate or some right or interest therein is in issue * * *."

[10]General Laws 1956 (1969 Reenactment) chapter 30 of title 9 is the "Uniform Declaratory Judgments Act."

[11]General Laws 1956 (1969 Reenactment) chapter 9 of title 34 deals with the determination of boundaries covered by tidewater which is to be distinguished from determination of title to land, whether covered by tidewater or not.

Under point 3 defendants argue that the trial justice erred in ordering defendants to give a deed of any kind to plaintiffs. They claim that even if plaintiffs' contentions were correct with respect to the proper interpretation to be given to the 1941 deed, a judicial declaration by this court recorded in the records of land evidence would be a perfectly adequate remedy and hence that no mandatory injunction is called for. They argue that the provisions of the reservation are self-executing and require no additional instrument.

Under point 4 defendants argue that the trial justice erred in ordering defendants to give a deed in fee simple to the pier to plaintiffs, as distinguished from a deed to an easement or some lesser estate. They contend that even if it be assumed for purposes of argument that the giving of a deed of some kind was proper, such a deed should only have been to the pier itself when constructed as required by the 1941 deed reservation and should certainly not have included the land under it, except possibly that said deed might properly contain an easement to encroach, that is, an easement to maintain the pier on defendants' land.

Under point 5 defendants argue that the trial justice erred in ordering defendants to give a deed to plaintiffs before they fulfilled the condition of constructing a pier. In brief, they argue that the demolition of the existing pier and the construction of a new one were conditions precedent to plaintiffs' entitlement to the pier. The plaintiffs contend that such is not the case and that the judgment compels defendants only to give a deed to the pier itself to evidence plaintiffs' ownership of such pier.

The plaintiffs claim that, by concensus of the parties to the 1941 deed, the pier is not realty but personalty. They point out that it is constructed of wooden pilings driven into the soil, that atop these pilings are crosstimbers and planking, and that granite blocks rest upon the outer edges

of the planking and contain the earthen fill placed upon the planking. The plaintiffs' position that the pier was intended to be treated as personalty by the parties is supported by a letter dated July 17, 1941 from Colonial's attorney to P&W's president where the former stated:

> "I am assuming that the pier would be deemed to be personal in view of our agreement that your Road is to own it and would thereby be taxed separate from the land. If this is to be so, we would be paying taxes on the land upon which you have your pier, and that would be contribution enough."

We believe that plaintiffs correctly perceived the meaning of the trial justice's order as requiring defendants to give plaintiffs a fee simple to personalty, that is, a conveyance of the totality of interests in the existing pier save for defendants' right to use the north side of said pier.[12] Thus, we agree also with defendants' claim that the 1941 deed conveyed to Colonial a fee simple to the land upon which the pier is constructed subject to an easement by reservation in P&W. We reject, however, defendants' contention that enjoyment of those easement rights by P&W or its successors is contingent upon their demolition of the existing pier and construction of a new one.

The current status of the property by virtue of the 1941 deed and reservations is that defendants, as Colonial's successors in title, own an undivided interest in the entirety of parcel 1, including the land beneath the pier, in fee subject to easement rights in P&W-Del., as P&W's successor in interest, to maintain a pier on the site of the existing pier. The trial justice's decision has not limited defendants' estate or created in them a lesser estate in the land.

We feel, however, that the trial justice erred in ordering

---

[12]Although generally the words "fee simple" are used to describe an absolute interest in real estate, we assume that the trial justice herein used the term loosely to refer to the totality of interest in the pier, even though said pier is personal property.

defendants to execute a conveyance of the pier to plaintiffs. We agree with their contention in this regard that the provisions of the 1941 deed reservation are self-executing and that the recording in the land evidence records of a judicial declaration by this court would accomplish the same results as the delivery of a conveyance to plaintiffs. The terms of the reservation clauses and the language of this opinion are sufficiently self-explanatory to put any interested party on notice that plaintiffs have exercised their reserved rights; that the pier is now plaintiffs' property; and that plaintiffs have a right to use the vessel berth on the north side of the pier. For the reasons stated, we hold that paragraph 2 of the judgment is superfluous, and, therefore, it is hereby vacated.

### Point 6

In view of our conclusion under point 1 that the trial justice did not err in adopting plaintiffs' interpretation of the reservations in the 1941 deed with respect to the intention of the parties thereto, we are constrained to hold that there is no merit to defendants' contention that the trial justice, under the guise of interpreting or construing the reservation in the 1941 deed, in fact, wrote a new and different reservation for the parties. This argument is so lacking in merit as to require no further discussion.

### Point 7

For the reasons stated in our discussion of points 3, 4 and 5, we find no merit in defendants' contention that the attempt of plaintiffs to claim a present interest in the pier is a claim of present ownership therein and contravenes the basic principle that when a deed shows an intent to vest a fee simple title in the grantee a subsequent attempted limitation upon the fee will be disregarded. As we stated in our discussion under points 3, 4 and 5, the 1941 deed conveyed to Colonial the fee title to the land subject to

the easement rights created by the reservations. The defendants, as Colonial's successors in title, still own the land in fee subject to the same easement rights and the trial justice's decision has not limited their estate or created in them a lesser estate in such land.

## Point 8

The defendants here contend that the reservation should be interpreted by this court as creating an easement in P&W to construct a pier whenever it desired to do so; that P&W would own such pier when it was constructed; and that P&W would have a right to maintain such pier by way of an encroachment on land belonging to defendants. The defendants urge, therefore, that this court should declare that P&W-Del. has no rights until such time as it is prepared to proceed with and complete such construction and that this court should rule that the term "construct" means to construct a new pier.

Our conclusion in resolving defendants' contentions under point 1 of their brief is dispositive of the present argument. For the reasons hereinbefore stated, this contention is without merit and requires no further discussion.

## Point 9

The defendants next contend that the judgment of the Superior Court ordering conveyance in fee of the pier including the right to use the vessel berth on the northerly side of the pier violated their rights in contravention of the fourteenth amendment to the Constitution of the United States.

As we have previously stated, the judgment does not compel defendants to convey any land. The judgment only orders defendants to convey to plaintiffs the presently-existing pier, including the right to use the vessel berth on the northerly side of the pier. In view of our earlier conclusion that the trial justice's interpretation was correct

and that he did not err in finding that plaintiffs were entitled to ownership of the pier and the right to use the vessel berth, we fail to see how it can be said that his action in this regard was arbitrary and capricious. For the reasons stated we find no merit in defendants' constitutional challenge.

### Point 10

The defendants' final contention is that the trial justice erred in not granting the relief sought in their counterclaim in C.A. No. 73-2372. The arguments made by the defendants here are, in substance, a repetition of arguments previously made by them in points 1 through 9 of their brief. We have already discussed, considered and disposed of those contentions adversely to the defendants. Thus further discussion of them in the context of the counterclaim will serve no useful purpose.

The defendants' appeals are denied and dismissed, the stay granted by the Superior Court is vacated, and the judgment appealed from is affirmed except with respect to paragraph 2 thereof which is overruled and paragraph 6 thereof which is overruled pro forma in accordance with the stipulation filed by the parties. The cases are remanded to the Superior Court for further proceedings in accordance with this opinion.

*Joseph R. Di Stefano,* for plaintiffs.

*Edwards & Angell, Gerald W. Harrington, Timothy T. More,* for defendants.

# APPENDIX A

# APPENDIX B

Reserving to the Providence and Worcester Railroad Company, its successors and assigns forever, the right to construct and maintain a pier on said Parcel No. 1 in the area between the southeasterly boundary thereof and the northwesterly line of the present pier thereon extending westerly to said established harbor line in the Seekonk River or to the harbor line

as the same may exist when such pier is built, the right to construct a pier being deemed to include the right to remove any pier now or hereafter existing within said area, to extend a pier constructed in the exercise of the right hereby reserved and to construct at any time or from time to time a new pier in place of any pier constructed in the exercise of said right, provided that such removal, extension and construction shall be done in such manner as not to interfere with the use hereinafter provided for by the Grantee, its successors or assigns, of the northerly side of a pier within said area and that any pier constructed or extended at any time in the exercise of said right shall be so constructed or extended as to permit along the northerly side thereof the convenient erection, use and maintenance of such pipe lines and equipment appurtenant thereto as shall be required by the Grantee, its successors or assigns, in the regular conduct of its or their petroleum products business; it being understood and agreed that the right hereby reserved may be exercised in behalf of the Providence and Worcester Railroad Company, its successors or assigns, by the lessee for the time being under said lease dated December 17, 1892, and it being also understood and agreed that any pier constructed in the exercise of the right hereby reserved is to remain the property of the Providence and Worcester Railroad Company, and its successors and assigns, and that it or they will pay all taxes assessed thereon except the taxes on the pipe lines and equipment appurtenant thereto hereinafter referred to and that the Grantee, its successors and assigns, shall have the right to erect, replace, use and maintain its pipe lines and equipment appurtenant thereto on the northerly side of any pier constructed in the exercise of the right hereby reserved and the right to have the free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business, this right, however, not to be deemed to exclude the right of the Providence and Worcester Railroad Company, its successors and assigns, to have vessels use said berth so far as may be consistent with such free and uninterrupted use by the Grantee, its successors and assigns, provided that (1) said pipe lines and equipment shall be located so as to interfere as little as practicable, consistently with their convenient location for the purposes for which they are required, with the use of such

pier by the Providence and Worcester Railroad Company, its successors and assigns; (2) the Grantee, its successors or assigns, shall remove said pipe lines and equipment upon abandoning the use of the same and (3) the Grantee, its successors or assigns, shall annually reimburse the Providence and Worcester Railroad Company, its successors and assigns, for the taxes assessed on said pier to an amount equivalent to what the taxes would have been on the last assessed valuation of the pier owned by the Grantee, its successors or assigns, and removed for the construction of such pier constructed in the exercise of the right hereby reserved, apart from any pipe lines and equipment on the pier so removed, had said pier continued to have been owned by the Grantee, its successors and assigns, and not been removed, but the Grantee, its successors or assigns, shall be entitled to a fair and equitable credit against such amount for any taxes paid by it or them during such year on the land occupied by said pier;

Reserving also to the Providence and Worcester Railroad Company, its successors and assigns forever, the right to have the area adjacent to any pier constructed in the exercise of the right hereby reserved kept free from structures which would prevent the berthing of vessels on the northerly side of said pier and to dredge within the area required for such berthing so as to render and maintain said area available for such berthing;

Reserving also to the Providence and Worcester Railroad Company, its successors and assigns forever, a right of way in the location indicated upon said plan for a railroad track and roadway and the right to construct and maintain a railroad track and roadway in said location; it being understood and agreed that the Grantee, its successors or assigns, shall not be obligated to keep said location clear of obstructions so long as the Providence and Worcester Railroad Company, its successors or assigns, do not desire to use the same in connection with the construction or maintenance of a pier in the exercise of the right hereinbefore reserved, but that the Grantee, its successors or assigns, shall clear said location from all obstructions upon ninety days' written notice from the Providence and Worcester Railroad Company, its successors or assigns.